1

2

3

4

5

6

7

8             UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10  C.H. MERCEDES STUBBS,

                                  NO. CIV. S-06-1 LKK/DAD
11

          Plaintiff,
12

     v.                              O R D E R
13

THE REGENTS OF THE UNIVERSITY
14  OF CALIFORNIA,

15          Defendant.
    _____/
16

17       Plaintiff is an African-American male with dyslexia who has

18  brought various claims under the Americans with Disabilities Act

19  ("ADA") and Title VII against his former employer, the Regents of

20  the University of California.  Specifically, plaintiff alleges (1)

21  disability discrimination, (2) failure to provide reasonable

22  accommodation, (3) race discrimination, and (4) retaliation.

23  Pending before the court is defendant's motion for summary

24  judgment.  The court resolves the matter upon the parties' papers

25  and after oral argument.  For the reasons set forth below, the

26  court denies the motion, except with respect to plaintiff's

                                  1

1  retaliation claim under the ADA.

2  **I. Facts**[1]

3  **A. General Background**

4      In January 2004, defendant hired plaintiff Mercedes Stubbs

5  for the position of Assistant Animal Technician at the

6  University of California Davis' California National Primate

7  Research Center (the "Center").  Def.'s Statement of Undisputed

8  Fact ("SUF") ¶ 18.  The Center is an organized research unit

9  that conducts biomedical research on a variety of human health-

10 related problems using primates as research subjects.  SUF ¶ 1.

11 It houses approximately 4,800 monkeys, many of whom are

12 inflected with infectious diseases, such as HIV/SIV and Herpes

13 B.  SUF ¶¶ 3-4.

14     There are approximately 100 Assistant Animal Technicians

15 employed at the Center.  SUF ¶ 6.  The Assistant Animal

16 Technicians are divided into crews responsible for various

17 aspects of animal care in compliance with applicable

18 regulations, guidelines, and protocols.  Id.  Plaintiff worked

19 in the Cage Change Crew, supervised by Ron Walgenbach, which is

20 responsible for changing and cleaning the cages of all 4,800

21 primates once every two weeks.  SUF ¶ 7.  Plaintiff was the only

22 African-American on his working crew.  Pl.'s Statement of

23 Disputed Facts ("SDF") ¶ 39.  The work on the Cage Change Crew

24 is physical, fast-paced, and requires several employees to work

25 _____

26      [1] The facts are undisputed unless otherwise noted.

2

in teams to lift and move heavy cages.  SUF ¶ 8.  Each team
within the crew cleans approximately three rooms of cages per
day by first boxing up the monkeys and then disinfecting the
cages with toxic chemicals.  SUF ¶ 9.

**B. Plaintiff's Employment Application & Interview**

Plaintiff had previously applied for the same Assistant
Animal Technician position in August 2003, although he was
rejected because he had failed to disclose information regarding
a felony reduced to a misdemeanor.  SUF ¶ 16.  In his job
application, plaintiff stated that he had never been "released
or discharged from employment or resigned to avoid such
discharge or release," although he had, in fact, been discharged
from the military and had been terminated from his job as a food
server at Travis Air Force Base.  SUF ¶ 21; Depo. of Mercedes
Stubbs ("Stubbs Depo.") 20:15-17, Ex. A, Decl. of Cori Sarno
("Sarno Decl."); SUF ¶ 24.  Furthermore, plaintiff indicated
that he had a high school diploma, when he had only passed the
GED test.  SUF ¶ 26.  Finally, plaintiff indicated that he had
not previously worked for UC, even though he had worked for
Temporary Employment Services.  SUF ¶ 25.

When plaintiff applied for the Assistant Animal Technician
position for a second time, Janis Lenox (plaintiff's then
girlfriend and now wife) acted on his behalf as the Assistant
Director of Administration for the Center.  She wrote a note to
Human Resources on plaintiff's background check application that
stated: "We are aware of Mr. Stubbs' 1992 misdemeanor and all

1  details involved and still want to hire him."  SUF ¶ 29.

2  Plaintiff was ultimately hired for the position by Ron

3  Walgenbach, the Cage Change Crew supervisor, and Jenny Short,

4  the Assistant Director of Colony Management.  SUF ¶ 33.  During

5  the interview, plaintiff disclosed that he had dyslexia.  Decl.

6  of Ronald Walgenbach ("Walgenbach Decl.") ¶ 6.  Plaintiff claims

7  that his dyslexia affects daily life activities, such as reading

8  and verbal communication.  SDF ¶ 28.  He takes Wellbutrin for

9  his condition, which has improved his concentration.  SUF ¶ 90.

10 **C. Plaintiff's Training and Course of Employment**

11 During the first two weeks of employment, plaintiff worked

12 with the department's training coordinator, Doug Miller.  SUF ¶

13 36.  The two went through the procedures, as set forth in

14 "attention-to-detail" lists, for each of the functions plaintiff

15 was to perform.  SUF ¶ 37.  After reviewing these attention-to-

16 detail lists, Miller performed the tasks as plaintiff watched.

17 SUF ¶ 37.  After that, plaintiff would perform the tasks while

18 Miller looked on.  SUF ¶ 38.  Plaintiff was allowed to take home

19 the materials to review, which was not normally permitted.  SUF

20 ¶ 122.

21 After the initial training, plaintiff was assigned to work

22 with various crew members.  In late April, early May 2004,

23 Walgenbach went on vacation for four days.  SUF ¶ 41.  During

24 that time, Brian Scarberry, the team leader, essentially took

25 over for Walgenbach.  SUF ¶ 42.  While working in one of the

26 rooms, Scarberry told plaintiff that he had done something

4

incorrectly, at which point plaintiff yelled at Scarberry and stormed out of the room.  SUF ¶ 43.  Thereafter, Scarberry requested a meeting with plaintiff, Doug Miller, and Jenny Short.  SUF ¶ 42.  At the meeting, plaintiff complained that Scarberry was too harsh and was pushing the crew too hard in Walgenbach's absence.  SUF ¶ 44.

After Walgenbach returned from vacation, a meeting was held on May 5, 2004 between Walgenbach, Short, and Miller to follow-up on the problem that had arisen between plaintiff and Scarberry.  SUF ¶ 45.  Id.  Short wanted to know if the problems that plaintiff was having were limited to when he worked with Scarberry or whether he was also having issues with other co-workers.  SUF ¶ 46.  She was informed by Walgenbach and Miller that plaintiff was not keeping pace with the rest of the crew, and that, because of this, other crew members did not want to be assigned to work with him.  SUF ¶ 47.  Short was also told that plaintiff mishandled toxic chemicals, did not retain the process of counting cages, accidentally let the monkeys loose, was resistant to criticism, and took very lengthy breaks.  Decl. of Jenny Short ("Short Decl.") ¶ 12.

Although plaintiff was on probationary status, it was decided that plaintiff should be given more time, because other employees who were initially slow to learn the process ultimately became good employees.  SUF ¶ 51.  Walgenbach decided to work alongside plaintiff more often to provide extra training.  SUF ¶ 52.  Miller also agreed to provide more one-on-

5

1  one training to help plaintiff master the cage changing process

2  and safety procedures.  Id.

3      Plaintiff maintains, however, that he was never properly

4  trained.  SDF ¶¶ 12-14, 36.  One of the Center's Senior Animal

5  Technicians, Edgardo Vasquez, who has worked at the Center since

6  1991, questioned "why nobody is training him [plaintiff]

7  properly."  SDF ¶ 14.  He observed that Scarberry did not treat

8  employees fairly in his training, was impatient, and lacked the

9  skills to train new employees.  SDF ¶ 13.  Vasquez did not work

10 in the same room as the Cage Change Crew but came into contact

11 with them once or twice a day.  Depo. of Edgardo Vasquez

12 ("Vasquez Depo.") 39:1-5, Ex. A, Decl. of Randal Barnum ("Barnum

13 Decl.").  Vasquez also stated that in the past, he heard the

14 words "nigger" and "wetback" used, as well as derogatory

15 language referencing women and gays and lesbians, but that

16 management had addressed it and that he had not heard derogatory

17 language used in the last three to five years.  Id. 31:21-34:12.

18     On May 18, 2004, an incident arose between plaintiff and

19 two of his co-workers, one of whom was Scarberry.  SUF ¶ 57.

20 Apparently, plaintiff sprayed the two with a hose that he was

21 using to perform his duties.  Id.  Plaintiff maintains that this

22 was accidental, Stubbs Depo. 158:15-16, whereas the co-workers

23 involved claim it was not, Scarberry Decl. ¶ 12.  In response,

24 Scarberry called plaintiff a "fucker" and stated "If you do that

25 again to me, I'll shove the hose up your ass."  Scarberry Decl.

26 ¶ 12.

1   After plaintiff complained to Walgenbach about this

2   incident, Walgenbach organized a meeting so that plaintiff could

3   explain his perspective.  SUF ¶ 58.  During the meeting, the two

4   other co-workers apologized to plaintiff.  SUF ¶ 59.  Plaintiff

5   was dissatisfied with the meeting and stated that it was biased

6   and that he wanted to transfer.  SUF ¶ 60.  He then stood up, at

7   which point Walgenbach requested that he sit back down and talk

8   to them.  Id.  Instead, plaintiff left the room.  Id.

9   After leaving the meeting, plaintiff went to Human

10  Resources at the Center and complained to H.R. manager Kristin

11  Antona that he was being discriminated against on account of his

12  race.  SUF ¶ 61.  In addition to complaining about the incident

13  with the hose, he alleged that work assignments and treatment

14  toward him were hostile and based on racial discrimination; that

15  his co-workers were not friendly; that he was frequently

16  assigned to work alone or work with Scarberry or Walgenbach (as

17  opposed to other members of the crew); and that he worked harder

18  and was assigned more work than others.  SUF ¶ 62.

19  After discussing the various methods for lodging a

20  complaint, plaintiff decided he wanted the Center to conduct an

21  informal review.  SUF ¶ 63.  Antona conducted the review, which

22  included interviews of employees and plaintiff's supervisor.

23  SUF ¶ 64.  Antona completed a report of her informal review on

24  May 27, 2004.  SUF ¶ 65.  Her report indicated that "[e]mployees

25  in the Cage Change area are friendlier to some employees than

26  others" but that "[t]here is no substantiation that this is

based on racial bias." Ex. E, Antona Decl. She concluded that
there was "no corroboration of behavior or management decisions
that would demonstrate racial discrimination or bias." SUF ¶
67.

On June 1, 2004, Walgenbach claims that plaintiff glared at
him when Walgenbach was giving plaintiff his work assignment in
the morning. SUF ¶ 68. Later that morning, Walgenbach and
plaintiff, among others, were in the locker room. Walgenbach
Decl. ¶ 29. Walgenbach overheard a conversation with plaintiff
and another co-worker in which profanity was used, and
Walgenbach said that they needed to watch their language. Id.
Another employee witness said that Walgenbach told plaintiff to
watch his mouth in a yelling and demeaning way. Vasquez Depo.
67:20. Walgenbach also informed plaintiff that a follow-up
meeting regarding his relations with the crew had to be
rescheduled due to a campus-wide sexual harassment class that
all employees had to attend. Id. Plaintiff became visibly
angry at this and stormed out of the locker room. Id.

Walgenbach attempted to catch up with plaintiff, who did
not respond and continued to walk away, even after Walgenbach
called out his name. Id. Walgenbach then placed his hands on
plaintiff's shoulders and turned him around. Id. Plaintiff
claims that he was violently spun around. During his
deposition, plaintiff stated that Walgenbach "physically turned
me around and shook me and said what was wrong with [him]." SDF
¶ 44. Plaintiff then yelled something to the effect of, "[g]et

your hands off me man" and "[d]on't ever touch me like that again!" and walked away.  Walgenbach Decl. ¶ 29.  Some employees who were present felt when Walgenbach placed his hands on plaintiff, it was a friendly gesture, SUF ¶ 69, whereas another interpreted it as disrespectful, SDF ¶ 17.

**D. Plaintiff's Termination**

At 7:25 a.m. on June 1, 2004, the Animal Care Supervisor for Husbandry, Jaleh Janatpour, paged Short at home regarding an encounter that she had just had with plaintiff.  SUF ¶ 71. Janatpour, a former Animal Control Officer with a background in law enforcement, informed Short that plaintiff had made a statement that she construed as a threat against plaintiff's supervisor, Walgenbach.  SUF ¶ 69.  Janatpour reported that plaintiff said something to the effect that "he was being bullied because he was black" (referencing the locker room incident).  SUF ¶ 73.  He also allegedly stated that a person in his past had bullied him, that plaintiff put him in the hospital, and that "that man never walked again."  SUF ¶ 73. Plaintiff denies making this statement.  Stubbs Depo. 190:4-6.

After Short spoke with Walgenbach about the threats, they both decided to release plaintiff from probation and terminate his employment.  SUF ¶ 75.  The decision to terminate plaintiff was based both on the alleged threat as well as plaintiff's performance, which had not improved in the four weeks since the May 1, 2004 meeting.  SUF ¶ 75.  Neither Short nor Walgenbach discussed the matter with plaintiff, nor confirmed that he had

9

1  made the statements relayed by Janatpour.  SDF ¶ 58.  While

2  ordinarily Walgenbach would be the one to release a crew member,

3  due to the threats, Short decided to release plaintiff herself

4  and instructed Walgenbach to go home early.  SUF ¶ 78.

5       Following the termination, Edgardo Vasquez, a Senior Animal

6  Technician, spoke with Scarberry.  When asked why plaintiff was

7  terminated, Scarberry said plaintiff was "dumb" and "stupid" and

8  mentioned something about plaintiff being black.  SDF ¶¶ 19, 25

9  ("He mention something about -- you know, something like being

10 dumb, stupid, and then mentioning something because he's

11 black.").

12      Plaintiff filed a charge with the EEOC on June 16, 2006

13 claiming race and disability discrimination.[2]  SUF ¶ 79.  He

14 further claimed that he had not been given proper training to

15 perform his job.  Id.  On March 3, 2005, plaintiff filed an

16 amended charge adding that he also believed that he had been

17 retaliated against for engaging in protected activity.  The

18 instant lawsuit was filed on January 4, 2006.  Plaintiff's

19 complaint alleges that he was the victim of race discrimination

20 and retaliation in violation of Title VII of the 1964 Civil

21 Rights Act.  He also claims that he was the victim of disability

22 discrimination and retaliation in violation of the Title I and

23 Title V, respectively, of the ADA.

24  _____

25      [2]  Notably, the complaint did not allege any claim of
   harassment or hostile work environment, and those claims are not
26 appropriately before the court now.

## II. Standard

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district

11

1  court demonstrates that the standard for entry of summary

2  judgment, as set forth in Rule 56(c), is satisfied."  Id. at

3  323.

4      If the moving party meets its initial responsibility, the

5  burden then shifts to the opposing party to establish that a

6  genuine issue as to any material fact actually does exist.

7  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

8  586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv.

9  Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

10     In attempting to establish the existence of this factual

11  dispute, the opposing party may not rely upon the denials of its

12  pleadings, but is required to tender evidence of specific facts

13  in the form of affidavits, and/or admissible discovery material,

14  in support of its contention that the dispute exists.  Fed. R.

15  Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First

16  Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

17  (9th Cir. 1998).  The opposing party must demonstrate that the

18  fact in contention is material, i.e., a fact that might affect

19  the outcome of the suit under the governing law, Anderson v.

20  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

21  No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347,

22  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

23  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and

24  that the dispute is genuine, i.e., the evidence is such that a

25  reasonable jury could return a verdict for the nonmoving party,

26

12

1  Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g

2  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

3       In the endeavor to establish the existence of a factual

4  dispute, the opposing party need not establish a material issue

5  of fact conclusively in its favor.  It is sufficient that "the

6  claimed factual dispute be shown to require a jury or judge to

7  resolve the parties' differing versions of the truth at trial."

8  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

9  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

10 'pierce the pleadings and to assess the proof in order to see

11 whether there is a genuine need for trial.'"  Matsushita, 475

12 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

13 note on 1963 amendments); see also Int'l Union of Bricklayers &

14 Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752

15 F.2d 1401, 1405 (9th Cir. 1985).

16      In resolving the summary judgment motion, the court

17 examines the pleadings, depositions, answers to interrogatories,

18 and admissions on file, together with the affidavits, if any.

19 Rule 56©; see also In re Citric Acid Litigation, 191 F.3d 1090,

20 1093 (9th Cir. 1999).  The evidence of the opposing party is to

21 be believed, see Anderson, 477 U.S. at 255, and all reasonable

22 inferences that may be drawn from the facts placed before the

23 court must be drawn in favor of the opposing party, see

24 Matsushita, 475 U.S. at 587 (citing United States v. Diebold,

25 Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also

26 Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121,

1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn
out of the air, and it is the opposing party's obligation to
produce a factual predicate from which the inference may be
drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.
1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th
Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party
"must do more than simply show that there is some metaphysical
doubt as to the material facts. . . . Where the record taken as
a whole could not lead a rational trier of fact to find for the
nonmoving party, there is no 'genuine issue for trial.'"
Matsushita, 475 U.S. at 587 (citation omitted).

### III. Analysis

For the reasons set forth below, the court denies
defendant's motion for summary judgment as to the disability
discrimination claim, the failure to provide reasonable
accommodation claim, and the race discrimination claim.  The
court grants in part and denies in part the motion for summary
judgment as to the retaliation claim.

**A. Disability Discrimination**

    **1. Affirmative Defenses**

        **a. Sovereign Immunity**

Plaintiff seeks money damages under two provisions of the
ADA: employment discrimination pursuant to Title I, 42 U.S.C. §
1211 et seq., and retaliation for protected conduct pursuant to
Title V, section 503, 42 U.S.C. § 12203.  At the outset,

however, defendant argues that it is entitled to sovereign

immunity from damages under the Eleventh Amendment.  See Board

of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356,

368 (2001) (finding that Title I of the ADA did not validly

abrogate states' Eleventh Amendment immunity); Demshki v.

Monteith, 255 F.3d 986, 988 (9th Cir. 2001) (extending Garrett

to encompass claims brought under Title V of the ADA).

        While defendant would ordinarily be entitled to immunity as

"an arm of the state" because it is a corporation created by the

California constitution, see Armstrong v. Meyers, 964 F.2d 948,

949 (9th Cir. 1992), here, it has waived the defense.  "Eleventh

Amendment immunity is an affirmative defense . . . that must be

raised 'early in the proceedings' to provide 'fair warning' to

the plaintiff."  Demshki, 255 F.3d at 989 (internal citations

omitted).  The complaint stated that "[d]efendant is an employer

subject to suit under the aforementioned statutes," Compl. ¶ 4,

referencing Title I and Title V of the ADA, Compl. ¶ 1.  In its

answer, defendant "admit[ted] it is subject to suit as an

employer under . . . Title I of the Americans with Disabilities

Act."  Answer ¶ 4.

        Accordingly, there is no dispute that defendant is liable

for damages related to employment discrimination under Title I.[3]

_____

        [3] Defendant argues that it was only admitting liability for
injunctive relief -- not damages -- but the pertinent paragraph in
the complaint did not state "defendant is an employer subject to
suit for injunctive relief."  Rather, it simply stated that
"defendant is an employer subject to suit."  Compl. ¶ 4.

1  Furthermore, while defendant did not expressly deny liability

2  for retaliation under Title V, any material allegation in the

3  complaint not denied in the answer is deemed admitted.  Fed. R.

4  Civ. P. 8(d) ("Averments in a pleading . . . are admitted when

5  not denied in the responsive pleading.").  Also, nowhere in the

6  answer did defendant assert sovereign immunity as an affirmative

7  defense.  Cf. Demshki, 255 F.2d at 989 (noting that the

8  defendant "raised Eleventh Amendment immunity as an affirmative

9  defense in its answer").  Defendant is therefore potentially

10  liable for damages under both provisions of the ADA at issue

11  here.

12                  **b. Injunctive Relief & Front-Pay**

13       Defendant also argues that plaintiff should not be entitled

14  to relief in the form of restitution or front-pay because of the

15  alleged fraud on his job application.  "If an employer discovers

16  that the plaintiff committed an act of wrongdoing and can

17  establish that the wrongdoing was of such severity that the

18  employee would have been terminated on those grounds alone if

19  the employer had known of it at the time of the discharge," the

20  employee is barred from obtaining reinstatement or front-pay,

21  and can only recover back-pay from the date of the discharge to

22  the date the new information was discovered.  O'Day v. McDonnell

23  Douglas Helicopter Co., 79 F.3d 756, 759 (9th Cir. 1996)

24  (internal quotation marks omitted).

25       Even assuming, arguendo, that the alleged application fraud

26  rose to such a level, after-acquired evidence is an affirmative

1  defense that must be pled in the answer.  Otherwise, it is

2  waived.  See Red Deer v. Cherokee County, Iowa, 183 F.R.D. 642,

3  653 (N.D. Ia. 1999) ("[T]he court concludes that 'after-acquired

4  evidence' is an affirmative defense that must indeed be pleaded

5  and proved pursuant to Rule 8(c)."); Jones v. Bd. of Trustees of

6  Community College Dist. No. 508, 75 F. Supp. 2d 885, 887 (N.D.

7  Ill. 1999) ("The defense is an affirmative one.").  Here,

8  defendant waived the defense by failing to pled it in its

9  answer.

10  **2. Prima Facie Case**

11  The ADA prohibits an employer from discriminating against a

12  disabled employer with respect to hiring, advancement,

13  discharge, compensation, job training, or any other term,

14  condition, or privilege of employment.  42 U.S.C. § 12112(a).  A

15  prima facie claim for discrimination under the ADA requires that

16  plaintiff show: (1) that she or he is a disabled person, (2)

17  that she or he is qualified, with or without reasonable

18  accommodation, to perform the essential functions of the job,

19  and (3) that she or he has suffered an adverse employment

20  decision because of the disability.  Snead v. Metro Prop. & Cas.

21  Ins. Co., 237 F.3d 1080, 1087 (9th Cir. 2001).  The burden for

22  proving a prima facie employment discrimination case is not

23  onerous, and does not even require proof by a preponderance of

24  the evidence.  Id. at 1091.

25  ////

26  ////

**a. Disabled**

First, defendant argues that plaintiff is not a disabled person within the meaning of the ADA.  "Disability" is defined to include "a physical or mental impairment that substantially limits one or more of the major life activities" of an individual.[4]  42 U.S.C. § 12102(2)(A).  There is no dispute that dyslexia is a "physical or mental impairment," see EEOC Compliance Manual § 902.3(b), or that plaintiff suffers from dyslexia, SDF ¶ 26.  Rather, the issue here is whether plaintiff's dyslexia substantially limits one or more of his major life activities.

During his deposition, plaintiff explained how his dyslexia impacted his daily life:

> Q:  [D]oes [dyslexia] have any effect on your day-to-day activities?
> A:  Yes, it does.
> Q:  How?
> A:  In terms of bills.  I want to read things sometimes.  I don't understand what I read.  Sometimes when I'm getting in conversation with people they may say some things I'm not sure what those words or whatever they're talking about, not sure how to understand it.

Stubbs Depo. 24:19-25:2.  During his job interview, plaintiff also explained that because of his dyslexia he "need[ed] more time studying things when [he's] not sure what they are" and he "need[ed] more time to learn things."  Id. 221:21-22.

---

[4] There are two additional means of establishing disability under the ADA: being regarded as disabled or having a record of disability.  42 U.S.C. § 12102(2)(B) & (C).  While plaintiff makes passing note of this, he does not present evidence or argument as to why he is disabled under these alternate definitions.  Accordingly, the court passes no judgment on these issues.

1   Nevertheless, he admitted that when he took Wellbutrin, it

2   increased his ability to pay attention, helped with his self-

3   control, and improved his concentration.  Id. 30:19-31:3.

4        In short, plaintiff appears to argue that his dyslexia

5   substantially limits two major life activities: (1) reading and

6   (2) learning (or, more broadly, thinking and concentrating).

7   With regard to reading, plaintiff's dyslexia does not impose a

8   substantial limitation.  Like the dyslexic plaintiff in Wong,

9   plaintiff admitted that he could read the newspaper, SUF ¶ 90,

10  and look for jobs in the newspaper, SUF ¶ 91.  See Wong v.

11  Regents of the Univ. of California, 379 F.3d 1097, 1109 (9th

12  2004) ("[Plaintiff] has not established that he was unable to

13  read newspapers, government forms, street signs, or the like.").

14  He also stated that he played bingo several hours a week, which

15  requires recognition of numbers/letters.  SUF ¶ 91.  Plaintiff

16  has not put forth sufficient evidence to create a genuine

17  dispute that his reading ability is substantially impaired.

18       With regard to learning, however, the court finds that

19  there is a genuine dispute.[5]  In Vinson, for example, the court

20  found that where a letter from plaintiff's college indicated

21  that he required extra study time due to his dyslexia, a

22  reasonable fact-finder could conclude that his learning ability

23  ────────────────────

24       [5] Based on the record, plaintiff appears to contend that some
    of his dyslexia-related problems existed independent of his reading
    deficits.  E.g., Stubbs Depo. 24:24-25:2 ("Sometimes when I'm
25  getting in conversation with people they may say some things I'm
    not sure what those words or whatever they're talking about, not
26  sure how to understand it.").

1  was substantially impaired.  Vinson v. Thomas, 288 F.3d 1145,

2  1153 (9th Cir. 2002).  Here, plaintiff similarly complained that

3  he "need[ed] more time to learn things."[6]  Stubbs Depo. 221:21-

4  22.  Furthermore, as detailed below, plaintiff's less-than-ideal

5  work performance in the first few months of his employment also

6  evidenced his learning impairments.

7      While the court in Wong rejected a similar claim that

8  dyslexia substantially impaired learning, it did so because of

9  plaintiff's academic success in medical school.  410 F.3d at

10  1065.  Here, in contrast, plaintiff attained only a GED.

11  Furthermore, although plaintiff stated that Wellbutrin helped to

12  improve his concentration, see Sutton v. United Airlines, Inc.,

13  527 U.S. 471 (1999) (requiring consideration of corrective

14  measures in assessing disability), this does not necessarily

15  mean that the improvement was sufficient to overcome a

16  substantial impairment.  Although a close issue, it would not be

17  unreasonable for one to conclude, based on the totality of the

18  evidence, that plaintiff's learning ability was substantially

19  impaired.

20          **b. Qualified**

21      Second, defendant argues that plaintiff is not a "qualified

22  individual," which is defined as one who is qualified to perform

23

24      [6] The fact that plaintiff learned how to dance, SUF ¶95, took
    community college classes, SUF ¶ 96, and once took a forklift
25  safety class, SUF ¶ 98, does not demonstrate that no reasonable
    fact-finder could construe substantial learning impairment in other
26  areas of life.

1  the essential functions of the jobs, with or without reasonable

2  accommodation.  Weyer v. Twentieth Century Fox Film Corp., 198

3  F.3d 1104 (9th Cir. 2000).  The essential functions of a job are

4  determined by reference to written job descriptions, the amount

5  of time spent on the function, and the employer's judgment.  29

6  C.F.R. § 1630.2(n)(3).

7       Here, defendant argues that plaintiff was unable to perform

8  the essential functions of the Assistant Animal Technician

9  position, because he had poor interpersonal skills, was

10 unwilling to follow orders, and had general performance issues.

11 An employee's ability to work reasonably well with others is an

12 essential function of any position.  See Williams v. Motorola,

13 Inc., 303 F.3d 1284, 1290-91 (11th Cir. 2002).  Here, neither

14 party disputes that there were interpersonal disputes between

15 plaintiff and various members of his team.  SUF ¶ 107.

16 Nevertheless, plaintiff maintains that the cause of these

17 disputes were attributable to others.

18      For example, plaintiff points to the incident with the

19 hose, in which Scarberry called him a "fucker" and threatened to

20 "shove the hose up [his] ass."  Scarberry Decl. ¶ 12.  In

21 another instance, plaintiff maintains that Walgenbach spun him

22 around and shook him.  SDF ¶ 44.  In addition, Edgardo Vasquez,

23 a Senior Animal Technician, felt that the work situation for

24 plaintiff "was not pleasant" and that plaintiff "was isolated

25 from the crew."  SDF ¶ 10.  If the interpersonal problems

26 experienced by plaintiff were a result of ostracism or shunning,

it would be unfair to deem him unqualified on this basis.[7]
There is at least a genuine dispute as to whether this was in
fact the case.

Second, defendant maintains that plaintiff had general
performance problems and did not follow orders.  With regard to
the alleged insubordination, plaintiff claims that Scarberry
would give him contradictory instructions, which is the subject
of a genuine dispute.[8]  SDF ¶ 36.  With regard to general
performance issues, there is little dispute that plaintiff was
not a model employee.  For example, he once left his co-workers
to clean a room because he was afraid of the monkeys, SUF ¶ 110;
he once let a monkey out of his cage, SUF ¶ 111; he attempted to
pick up a rolling cage by himself, risking injury to himself and
others, SUF ¶ 54; and, as noted earlier, he mishandled chemicals
and took lengthy breaks.  Scarberry complained that "[i]t was as
if each day was his first day on the job."  Scarberry Decl. ¶ 6.

---

[7] This is not to suggest, however, that mere ostracism is
actionable.  It is not.  See Brooks v. City of San Mateo, 229 F.3d
917, 924 (9th Cir. 2000) ("[B]ecause an employer cannot force
employees to socialize with one another, ostracism suffered at the
hands of co-workers" does not establish discrimination.").
Nevertheless, if plaintiff's co-workers unfairly shunned him, that
fact would be relevant to the narrow issue of whether he was
unqualified based on his inability to get along with others.

[8] In his deposition, plaintiff was asked why he continued to
ask questions in spite of his training, to which he responded:
"Because [of] the changes.  When you train me one way then all of
a sudden I come back and you complain and say why didn't you do
that just the way you show me, then whose fault is that?  Is that
mine?  No."  Stubbs Depo. 301:18-21.

1    Nevertheless, whether an individual is qualified must be

2  determined based on the receipt of reasonable accommodation.

3  Weyer, 198 F.3d at 1104.  Here, plaintiff maintains that he was

4  not properly trained in light of his dyslexia, SDF ¶ 36, and the

5  observations of at least one other employee, Edgardo Vasquez,

6  confirm this, SDF ¶ 14.  Admittedly, defendant made some efforts

7  to accommodate plaintiff.  For example, after the May 5, 2004

8  meeting, Miller, the department's training coordinator, agreed

9  to provide more one-on-one training, and Walgenbach decided to

10  work alongside plaintiff more often.[9]  SUF ¶ 51.  Plaintiff was

11  also allowed to take home the attention-to-detail lists, which

12  was not normally allowed.  SUF ¶ 122.

13    In spite of this, there was also evidence that Scarberry,

14  as one of the senior employees on plaintiff's crew, was

15  impatient, had poor personal skills, and was not a good person

16  to train new employees -- at least by the account of Edgardo

17  Vasquez.  Vasquez Depo. 44:2-5.  Furthermore, Scarberry's

18  training and feedback to plaintiff might have been undermined by

19  interpersonal problems that, in turn, were caused by Scarberry's

20  alleged racism -- not an unreasonable inference, given his use

21  of the word "black" as a derogatory term.  SDF ¶ 25.  In

22  addition, plaintiff maintains that Scarberry gave contradictory

23

24    [9]  Ironically, this particular attempt at accommodation
    backfired, because in his complaint of discrimination to Kristin
25  Antona, the H.R. manager, plaintiff noted that he was frequently
    assigned to work alone or work with Scarberry or Walgenbach, as
26  opposed to other members of the crew.

23

1  instructions, which, if true, had the potential to unravel the

2  training conducted by others, such as Walgenbach and Miller.

3  SDF ¶ 36.

4      As with the issue of whether plaintiff is a disabled

5  individual, the issue of whether plaintiff is a qualified

6  individual is also a close one.  But for Brian Scarberry, there

7  would be little difficulty in concluding that plaintiff received

8  reasonable accommodation for his dyslexia and that, based on his

9  performance, he was not qualified for the position.

10 Nevertheless, Scarberry's interpersonal problems with plaintiff

11 provide the foundation for the inference that plaintiff's

12 training was inadequate.  Moreover, because the burden of

13 proving a prima facie case is "not onerous," Snead, 237 F.3d at

14 1081, the court finds that there is a genuine dispute as to

15 whether plaintiff was a qualified individual with reasonable

16 accommodation.

17          **c. Adverse Employment Decision Because of Disability**

18     Third, plaintiff must establish that the adverse employment

19 decision was taken because of his disability.  Plaintiff states

20 that "they just [said], I'm letting you go because they got

21 tired of you, telling you what to do over and over again."

22 Stubbs Depo. 297:24-298:1.  This is sufficient, at this initial

23 stage of the analysis, to satisfy plaintiff's burden of

24 demonstrating a nexus between plaintiff's disability and his

25 subsequent termination.

26 ////

1 **3. Legitimate Non-Discriminatory Reason**

2 Once plaintiff has established the prima facie case, the

3 burden then shifts to defendant to demonstrate that the adverse

4 employment action occurred for a legitimate non-discriminatory

5 reason.[10]  Texas Dep't of Community Affairs v. Burdine, 450 U.S.

6 248, 252-252 (1981).  The defendant's burden with respect to

7 this stage of the analysis is merely one of production, and

8 "defendant need not persuade the Court that it was actually

9 motivated by the proffered reasons."  Id. at 254.

10 Here, defendant argues that the legitimate non-

11 discriminatory reason for plaintiff's termination was that (1)

12 he was not qualified for the position, and (2) he had made a

13 threat against Walgenbach.  Plaintiff's performance was clearly

14 a concern, as demonstrated at the May 5, 2004 meeting, when

15 Miller and Walgenbach agreed to provide plaintiff additional

16 training.  Furthermore, the alleged threat was reported to the

17 Center immediately after it occurred, SUF ¶¶ 71-72; it was

18 relayed by Jaleh Janatpour, a supervisor with a background in

19 law enforcement who felt the threat was sufficiently credible to

20 warrant reporting, SUF ¶¶ 71-74; and defendant took precautions

21 to suggest it honestly believed the threat, such as having Short

22 rather than Walgenbach terminate plaintiff, SUF ¶ 135.  Taken

23

24 [10] Although plaintiff has not technically "proven" the prima
facie case in light of the disputed facts noted above, the court
25 nevertheless proceeds with the McDonnell Douglas analysis to
determine whether defendant's motion for summary judgment should
26 alternately be granted on the grounds that its proffered reason for
termination was non-pretextual.

1  together, this is enough to satisfy defendant's burden of

2  production.

3  **4. Pretext**

4  Finally, once defendant establishes the existence of a

5  legitimate non-discriminatory reason, the <u>McDonnell Douglas</u>

6  presumption drops out of the picture, and plaintiff must

7  demonstrate these proffered reasons were pretextual and not the

8  true reasons for the employment decision.  <u>Burdine</u>, 450 U.S. at

9  253.  He may do this "either directly by persuading the court

10 that a discriminatory reason more likely motivated the employer

11 or indirectly by showing that the employer's proffered

12 explanation is unworthy of credence."  <u>Id.</u> at 256.

13 Here, there is evidence from which a trier of fact could

14 conclude that defendant's proffered reasons were pretextual, and

15 that disability discrimination was at least partially the reason

16 for the decision.  As noted earlier, Scarberry remarked to

17 Vasquez after plaintiff's termination that plaintiff was "dumb"

18 and "stupid."[11]  SDF ¶ 25.  Plaintiff also maintains that he was

19

---

20  [11] Although Scarberry was not a decisionmaker, he might have
    influenced the ultimate decision to terminate plaintiff, given that
21  he had previously met with Miller, who was a decisionmaker, when
    a dispute arose in Walgenbach's absence.  This has also been
22  referred to as the "cat's paw" theory of liability.  <u>See</u> <u>EEOC v.</u>
    <u>BCI Coca-Cola Bottling Co. of Los Angeles,</u> 450 F.3d 476, 486 (10th
23  Cir. 2006) ("A biased low-level supervisor with no disciplinary
    authority might effectuate the termination of an employee from a
24  protected class by recommending discharge or by selectively
    reporting or even fabricating information in communications with
25  the formal decisionmaker.").  This does not, however, mean that
    Scarberry's comments constitute direct evidence of discrimination
26  permitting plaintiff to bypass the <u>McDonnell Douglas</u> framework, as
    plaintiff attempts to argue.

told that "they [presumably, his supervisors] got tired of you,
telling you what to do over and over again."  Stubbs Depo.
297:24-298:1.  A reasonable inference -- although certainly not
a necessary one -- is that these comments were directed toward
plaintiff's dyslexia.

   With regard to the alleged threat made by plaintiff, there
is certainly evidence to suggest that defendant honestly
believed it to be true.  Nevertheless, when plaintiff asked why
he was being released, Short cited performance-related reasons
and omitted any mention of the alleged threat that he had made
against Walgenbach.[12]  The fact that no one ever discussed the
allegation with plaintiff is a relevant fact from which a trier
of fact could infer that defendant seized upon an ostensibly
plausible reason to terminate plaintiff.[13]  Discriminatory animus
need not be the only reason for the decision; it need only be "a
motivating factor."  Head v. Glacier Northwest, Inc., 413 F.3d
1053, 1065 (9th Cir. 2005).

---

[12] Plaintiff also argues that defendant's subsequent reliance
on the alleged threat as grounds for his termination is a "shifting
reason" from which one can allege pretext.  This misstates the law.
See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1063 (9th
Cir. 2002) (the presence of shifting justifications for an adverse
action is not sufficient to defeat summary judgment when those
justifications are not incompatible).  Here, defendant's
justifications (performance issues and plaintiff's alleged threat)
are not incompatible.

[13] Short stated that she "did not provide [plaintiff] with
each and every reason for his release because [she] was afraid it
would provoke him."  Short Decl. ¶ 51.  Nevertheless, if it was to
form the central grounds for his release, presumably some fact-
checking would be appropriate.

1    The fact that the same actors who hired plaintiff also

2   terminated him does not prove the absence of pretext.  The same

3   actor doctrine creates a strong but not irrebutable inference

4   that there was no discriminatory action.  See Coghlan v. Am.

5   Seafoods Co., 413 F.3d 1090, 1096 (9th Cir. 2005) ("The

6   same-actor inference is neither a mandatory presumption (on the

7   one hand) nor a mere possible conclusion for the jury to draw

8   (on the other).  Rather, it is a 'strong inference' that a court

9   must take into account on a summary judgment motion.").

10    Here, while it is true that both Short and Walgenbach knew

11   of plaintiff's dyslexia, and that they hired and fired him

12   within a relatively short period of time, there are other

13   reasonable inferences of discrimination that could be drawn.

14   For instance, it is possible that, while Short and Walgenbach

15   recognized that plaintiff had dyslexia, they did not fully

16   appreciate that they would also have to accommodate the

17   condition, or what that entailed.

18    Furthermore, the same actor inference can be rebutted by

19   showing that a non-decisionmaking employee was biased and

20   inappropriately influenced the decisionmaker's employment

21   decision under a cat's paw theory of liability.  This would

22   explain why a seemingly non-discriminatory hiring decision could

23   come from the same individuals who, perhaps unknowingly, carried

24   out a discriminatory firing decision.  Here, plaintiff maintains

25   that Scarberry exerted such influence on Short and Walgenbach.

26   See supra, n.11.  Accordingly, there is a genuine dispute on the

1   issue of whether defendant's proffered reasons were pretextual,

2   rendering summary judgment inappropriate.

3   **B. Failure to Provide Reasonable Accommodation**

4        The ADA also prohibits discrimination in the form of

5   failure to provide reasonable accommodation to a known

6   disability.  42 U.S.C. § 12112(b)(5)(A).  "Reasonable

7   accommodation" includes "modifications or adjustment to the work

8   environment, or the manner or circumstances under which the

9   position held or desired is customarily performed, that enable

10  an individual with a disability to perform the essential

11  functions of that job."  29 C.F.R. § 1630.2(n)(1).  As noted

12  above, however, there is a genuine dispute as to whether the

13  training that plaintiff received was sufficient, given that

14  Scarberry (allegedly) had poor training skills training skills,

15  gave contradictory instructions, and potentially harbored

16  discriminatory animus that undermined his relationship with

17  plaintiff.

18       Furthermore, plaintiff contends that he was entitled to

19  transfer to a different crew as a reasonable accommodation -- a

20  request to which defendant did not respond.  See Buckingham v.

21  U.S., 998 F.2d 735, 720 (finding no per se rule against

22  transfers as reasonable accommodations under the Rehabilitation

23  Act); McAlindin v. County of San Diego, 192 F.3d 1226, 1236-37

24  (9th Cir. 1999) (reversing grant of summary judgment where there

25  was no evidence that arranging a transfer would impose undue

26  hardship under ADA).  There is similarly a genuine dispute as to

1 whether a transfer could have cured the training deficiencies

2 noted above.

3 **C. Race Discrimination**

4     Title VII makes it unlawful for an employer to

5 "discriminate against any individual with respect to his

6 compensation, terms, conditions, or privileges of employment,

7 because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).

8 An employee suffers disparate treatment "when he or she is

9 singled out and treated less favorably than others similarly

10 situated on account of race."  Cornwell v. Electra Cent. Credit

11 Union, 439 F.3d 1018, 1028 (9th Cir. 2006) (internal quotations

12 omitted).  A prima facie case of race discrimination requires a

13 plaintiff to prove (1) membership in a protected class; (2) that

14 she or he was qualified for the position; (3) that she or he

15 suffered an adverse employment action; and (4) that a similarly

16 situated employee was treated more favorably.  Godwin v. Hunt

17 Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998).

18     Here, plaintiff is an African-American employee who was

19 fired, and a fact-finder could conclude that he was qualified

20 with reasonable accommodation for his dyslexia, as discussed

21 above.  Furthermore, none of the other employees on his crew --

22 who were not black -- were fired.  Defendant has also

23 articulated legitimate non-discriminatory reasons for the

24 termination: that plaintiff had made a threat and that he was

25 underperforming.  Accordingly, the primary issue is whether

26 plaintiff has shown a genuine dispute that the proffered reasons

1   were pretextual or that a discriminatory reason more likely

2   motivated the termination.  <u>Burdine</u>, 450 U.S. at 256.

3        As noted earlier, Scarberry reportedly use the word "black"

4   in a derogatory sense when responding to Vasquez's question

5   about why plaintiff was fired.  Although Scarberry was not a

6   decisionmaker, a reasonable fact-finder could conclude that he

7   nevertheless had access to the relevant decisionmakers,

8   Walgenbach and Short.  Furthermore, a reasonable fact-finder

9   could conclude that he negatively influenced their perception of

10  plaintiff, and that he did so at least in part because of racial

11  animus.  This is all grist for the jury mill, not summary

12  judgment.

13  **D. Retaliation**

14       Finally, plaintiff alleges a claim for retaliation under

15  Title VII and the ADA.  To establish a prima facie case of

16  retaliation under either statute, a plaintiff must demonstrate:

17  (1) a protected activity; (2) an adverse employment action; and

18  (3) a causal link between the protected activity and the adverse

19  employment action.  <u>Cornwell</u>, 439 F.3d at 1034-35.

20       Here, plaintiff asserts that he was retaliated against for

21  making complaints of racial discrimination and for requesting

22  accommodations for his disability.  His first complaint to H.R.

23  manager Kristin Antona in May 2004 raised complaints of racial

24  discrimination.  He raised a similar claim with Jaleh Janatpour

25  on June 1, 2004 -- the day before he was fired.  Proximity in

26  time between the protected action and the adverse employment

1  action is, by itself, enough to infer the causal connection

2  required by the third element of the prima facie case.  <u>Yartzoff</u>

3  <u>v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987).  Nevertheless,

4  plaintiff has only identified Title VII-protected activity, and

5  has not identified any ADA-protected activity.  Accordingly,

6  summary judgment as to plaintiff's Title I ADA claim is

7  appropriate.

8      Once plaintiff establishes the prima facie case, he may

9  resort to the <u>McDonnell Douglas</u> framework.  <u>Cornwell</u>, 439 F.3d

10  at 1035.  Viewing the record as a whole, one could conclude that

11  defendant terminated plaintiff in retaliation for his complaints

12  of racial discrimination.  Accordingly, summary judgment must be

13  denied as to plaintiff's Title VII retaliation claim.

14                       **IV. Conclusion**

15      As set forth above, the motion for summary judgment is

16  DENIED as to the disability discrimination claim, the failure to

17  accommodate claim, the race discrimination claim, and the Title

18  VII retaliation claim.  The motion for summary judgment is

19  GRANTED as to the retaliation claim under Title I of the ADA.

20      IT IS SO ORDERED.

21      DATED: May 24, 2007.

22

23                         _____
                           LAWRENCE K. KARLTON
24                         SENIOR JUDGE
                           UNITED STATES DISTRICT COURT
25

26